UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-61122-CIV-COHN/SELTZER

THE CITY OF FORT LAUDERDALE,

     Plaintiff,

v.

HEZZEKIAH SCOTT,

     Defendant/Counter-Plaintiff,

VIRGIL BOLDEN, GLORIA BURNELL,
KAREN MCNAIR, and THE ESTATE
OF WALTER TIRSCHMAN,

     Counter-Plaintiffs/Third-Party Plaintiffs,

v.

THE CITY OF FORT LAUDERDALE,

     Counter-Defendant,

ALFRED G. BATTLE, JR., Director of
Community Redevelopment Agency,
in his official and individual capacities,

     Counter-Defendant/Third-Party Defendant.
_____/

## ORDER GRANTING COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Plaintiff/Counter-Defendant City of Fort Lauderdale's and Counter-Defendant Alfred G. Battle, Jr.'s Motion for Final Summary Judgment [DE 192].  The Court has carefully considered the motion, response, and reply, as well as the parties' factual statements and record submissions, and is otherwise fully advised in the premises.

## I.    Material Facts

As discussed further herein, this case involves counterclaims and third-party claims brought by five current and former residential-property owners ("Counter-Plaintiffs") against the City of Fort Lauderdale ("City") and the Director of the City's Northwest–Progresso–Flagler Heights District Community Redevelopment Agency (together, "Counter-Defendants").[1]  These claims generally allege a coordinated effort by Counter-Defendants to acquire properties in the Northwest part of the City for redevelopment by imposing excessive code-violation fines against black property owners, obtaining liens on their properties based on the unpaid fines, and foreclosing on those liens.  Set forth below are the material facts regarding each Counter-Plaintiff.[2]

---

[1]  Counter-Plaintiffs previously moved to certify a class of property owners affected by Counter-Defendants' alleged conduct.  See DE 16.  The Court denied the class-certification motion without prejudice, allowing Counter-Plaintiffs to renew the motion upon filing an Amended Counterclaim.  See DE 102 at 21.  Although Counter-Plaintiffs' current Amended Counterclaim includes class allegations, see DE 106 at 8-9, Counter-Plaintiffs have not renewed their motion for class certification.  Accordingly, the Court's analysis of the present summary-judgment motion is based on Counter-Plaintiffs' individual claims.

[2]  Counter-Plaintiffs' response to Counter-Defendants' statement of material facts does not correspond with the paragraph numbering used by Counter-Defendants, as required by Local Rule 56.1(a).  See DE 247 at 7-14.  Further, many of the facts that Counter-Plaintiffs recite are not supported by specific references to the record, as mandated by Local Rule 56.1(a)(2).  See id. at 1-14.  These deficiencies have made it more difficult for the Court to ascertain the facts, both disputed and undisputed, material to Counter-Defendants' motion.  Where material facts recited by Counter-Defendants and supported by evidence of record are not specifically controverted by Counter-Plaintiffs, the Court deems those facts admitted.  See S.D. Fla. L.R. 56.1(b).

Also, four of the Counter-Plaintiffs have submitted affidavits in response to Counter-Defendants' summary-judgment motion and statement of material facts.  See DE 252-22 (Bolden); DE 252-23 (Carlson/Tirschman); DE 257-6 (Scott); DE 258-3 (Burnell).  These affidavits were executed after Counter-Plaintiffs were deposed and include generalized, identical statements such as "I was a victim of [a 2004] Code Enforcement Sweep," "I always responded to the violations and complied," and "I lost my property due to these code enforcement activities."  As discussed herein, many of these assertions are refuted by Counter-Plaintiffs' own deposition testimony and other

### A.   Hezzekiah Scott

Counter-Plaintiff Hezzekiah Scott previously owned residential property in the City at 2621 NW 18th Court, though he never resided at the property and used it only for rental income.  See DE 191 at 5, ¶ 16.  On May 8, 2000, Scott was cited by the City for trash and missing ground cover on his property.  See id. at 5, ¶ 17.[3]  After Scott failed to correct these violations, a Notice of Violation was issued on May 25, 2000, requiring Scott to correct the violations within a specified time or appear before the Special Master.[4]  See id.  Because the City failed to obtain service on Scott, he was provided with another Notice of Violation, and the Special Master hearing was rescheduled for August 17, 2000.  See id. at 5-6, ¶ 17.  Scott did not request additional time to comply, and he voluntarily failed to appear for the hearing.  See id. at 6, ¶ 17. As a result, an Order was issued requiring the installation of required ground cover throughout the property, to be completed by September 16, 2000, or a daily fine of $25.00 would begin to accrue.  See id.  Scott did not comply with the Order, nor did he

---

specific evidence in the record.  Moreover, as Counter-Defendants point out, the affidavits contain a number of statements that are demonstrably false.  See DE 262 at 3-6.  As just one example, Counter-Plaintiff Bolden asserts that he was the victim of a 2004 code-enforcement sweep and that he was unable to complete the necessary repairs to his properties after Hurricane Wilma struck in 2005.  See DE 258-2 at 2.  But the record shows that Bolden sold his properties in April 2002 and therefore no longer owned them at the times alleged in his affidavit.  See DE 211-2 at 2-4.  For all these reasons, the Court finds that Counter-Plaintiffs' affidavits do not provide substantial evidence material to Counter-Defendants' summary-judgment motion.

   [3]  As with the other code violations at issue in this case, a City inspector apparently notified Scott of this violation through an Inspection Report, which listed the details of the violation, specified the time by which the violation must be corrected, and included contact information for the inspector.  See DE 197-2 at 3, ¶ 5.

   [4]  While the record often refers to this officer as the "Special Master," the current official title for this individual is "Special Magistrate."  See Fort Lauderdale, Fla., Code of Ordinances § 11-10.

ask for additional time to comply.  See id.  Because Scott had failed to pay the required

fines, an Order Imposing a Fine and Lien and Foreclosure Notice was issued on

October 5, 2000.  See id.  After several re-inspections, Scott's property was brought

into compliance on May 10, 2001.  See id.  On September 23, 2004, the Special Master

issued an Order requiring Scott to pay the outstanding fines.  See id.  To date, however,

Scott has not paid the lien resulting from the fines.  See id.

Separately, on March 25, 2002, Scott's property was cited for the building having

"chipped, peeling and mildew stained paint," for garbage carts being left out on the curb

after service, and for the "chain link fence [having] bent rails and [being] in general

disrepair."  DE 191 at 6, ¶ 18.  Scott failed to timely correct the violations, and, on

May 3, 2002, a Notice of Violation was issued and served on Scott.  See id.  In that

Notice, Scott was ordered to correct the violations or appear for a hearing before the

Special Master on June 6, 2002.  Id.  Again, Scott voluntarily decided not to appear at

the hearing.  See id.  The Special Master issued an Order giving Scott until July 6,

2002, to correct the violations or face a daily combined fine of $125.00.  See id.

Because Scott neither remedied the violations nor paid the fines, a Claim of Lien was

issued and recorded on November 7, 2002.  See id.  Thereafter, Scott still did not

correct all the violations, and a second Order Imposing a Fine and Lien and Foreclosure

Notice was issued and recorded on September 23, 2004.  See id. at 6-7, ¶ 18.  As of

this date, Scott has failed to pay the lien.  See id. at 7, ¶ 18.

On August 17, 2003, Scott was cited for derelict vehicles being on his property.

See DE 191 at 7, ¶ 19.  As a repeat offender, he was issued a Notice of Violation on

September 29, 2003, requiring him to correct the violation or to attend a Special Master

hearing on October 2, 2003.  See id.  Scott did not remedy the violation and once again

chose not to appear for the hearing.  See id.  On October 3, 2003, another Notice of Violation was issued and served on Scott, requiring him to correct the violation or attend a hearing on October 16, 2003.  Scott did not address the violation and elected not to appear at the hearing.  See id.  Therefore, on October 16, 2003, the Special Master issued an Order requiring Scott to correct the violation by October 30, 2003, or face a daily fine of $250.00.  See id.  Scott failed to cure the violation, and an Order Imposing a Fine and Lien and Foreclosure Notice was issued and recorded in December 2003. See id.  Scott has never paid the lien.  See id.

On August 23, 2006, Scott was cited for a derelict, unlicensed, and/or inoperable vehicle on his property.  See DE 191 at 7, ¶ 20.  After receiving several extensions to address the violation, on October 26, 2006, Scott was served with a Notice of Violation requiring him to "remove, license and/or make operable gold Jaguar with flat tires and expired tag . . . on the property" by December 7, 2006, or to appear before the Special Master on that date.  Id.  Scott failed to correct the violation and elected not to appear at the hearing.  See id. at 8, ¶ 20.  The Special Master subsequently issued an Order mandating Scott's compliance within ten days, or a daily fine of $100.00 would begin to accrue on December 18, 2006.  See id.  Scott did not comply with the Order, and, on January 8, 2007, the vehicle was towed by the City.  See id.  Thereafter, a hearing was scheduled for February 1, 2007, to impose fines against Scott.  See id.  Again, though, he chose not to appear at the hearing.  See id.  Fines of $210.00 were imposed by the Special Master, and a lien was recorded on February 19, 2007.  See id.  This lien, like the others against Scott's property, remains unpaid.  See id.

In his deposition in this case, Scott admitted that he received the City's notices of code violations, hearings, and orders concerning his property, but that he did "nothing"

timely in response to the notices.  DE 191 at 8, ¶ 21.[5]  Scott also conceded that he did

not attend any of the hearings regarding his property.  See id. at 8, ¶ 22.  Referring to

the Special Master, Scott testified, "She [is] not a judge, but I never did go to one of

those [hearings].  My wife told me to go, go do and I was too stubborn, I didn't go.  Like

I said, I admit I got those letters, but I was too tired to go."  Id.[6]  Nonetheless, Scott

understood that the City could foreclose on his property.  Id. at 8, ¶ 23.

 Although Scott admitted that he never addressed the code violations in a timely

fashion, he claimed that he always took care of them eventually.  See id. at 8, ¶ 24.

Scott further testified that he did not attend the hearings because he feared that he

would be arrested, based on language contained in some of the City's notices.  See DE

198-1 at 10; DE 199-1 at 7-8; DE 252-11 at 2.  More specifically, Scott thought he might

be arrested because he had not corrected the code violations.  See DE 252-11 at 2.

Scott acknowledged, however, that he was never arrested for any of the violations,

even though he personally met with city officials to discuss the citations.  See DE 198-1

at 16; DE 199-1 at 8; DE 252-11 at 5, 7.

 On April 8, 2008, the City filed a Complaint for Foreclosure against Scott and his

Unknown Spouse, in the Circuit Court of the 17th Judicial Circuit in and for Broward

County, Florida, arising from the City's liens on Scott's property ("Lien Foreclosure

Action").  See DE 275 at 1-2, ¶ 1.  Ultimately, though, Scott lost his property not though

foreclosure but instead because he chose to stop paying the property taxes.  After four

---

 [5]  Scott testified that the City's initial Inspection Reports notifying him of the violations were posted on his door and that the subsequent notices and orders were mailed to him.  See DE 252-11 at 5.

 [6]  Scott also admitted receiving a letter from the City offering potential amnesty or reduction of his liens, but he did not respond and did not attend the hearing.  See DE 191 at 8-9, ¶ 25.

years of unpaid taxes, the property was sold to a private party at a Broward County tax-deed sale in July 2011.  See DE 191 at 9, ¶ 26; DE 275 at 2, ¶ 3.[7]  In his deposition, Scott testified that "I didn't pay the taxes because it was a lien on the property of $134,000, and I was afraid if I paid the taxes, there is a possibility I would lose the house because I couldn't pay the $134,000."  DE 191 at 9, ¶ 26.

**B.   Virgil Bolden**

Counter-Plaintiff Virgil Bolden has owned many rental properties in the City.  See DE 191 at 11, ¶ 40.  Two of his former properties, located at 202 NW 14th Avenue and 1401 NW 2d Street, are at issue in this case.  See id. at 12, ¶ 41.  The buildings located at these addresses were rooming houses, and Bolden would rent the rooms based on verbal agreements.  See id.  Bolden sold these properties to a private party in April 2002.[8]  See id. at 12, ¶ 42.

From 1996 until the date of sale, the property at 1401 NW 2d Street was the subject of thirty-four code-enforcement cases, including the following violations: operation of an illegal rooming house, unsafe structures on the property, trash, debris, derelict vehicles, overgrowth, broken windows, expired permits for work being done on the property, and inoperable or missing smoke detectors and fire extinguishers.  See DE 191 at 12, ¶ 43.  In 1996, some of the buildings on that property were deemed unsafe and were demolished after Bolden signed a demolition waiver.  See id. at 12,

---

[7]  As Scott no longer has any ownership interest in the property, the City has moved to dismiss the foreclosure action against him as moot.  See DE 275.

[8]  Because Bolden sold the properties more than ten years ago, Counter-Defendants argue that his constitutional claims in this action are barred by the statute of limitations.  See DE 192 at 22-23.  While this argument may have merit, the Court declines to reach the limitations question and instead bases its ruling on the other issues discussed herein.

¶ 44.  A demolition lien was later recorded, but Bolden agreed to make monthly payments, resulting in the lien being paid off in March 2003.  See id.

From 1986 through the time Bolden sold the property at 202 NW 14 Avenue, that property was the subject of at least nine code-enforcement cases.  See DE 191 at 12, ¶ 45.  Those cases included citations for operating an illegal rooming house, expired plumbing and electrical permits, removal of a water meter, derelict vehicles, and trash and debris.  See id.

In his deposition, Bolden acknowledged that he received at least some of the notices from the City regarding the code violations in his buildings and that he attended one hearing.  See DE 252-5 at 2.  Moreover, Bolden admitted that there were never any smoke detectors in his buildings.  See DE 191 at 12, ¶ 46.  Bolden also knew that vagrants were living in the buildings, but he did nothing to keep them out because "[t]hey protect" the property.  Id. at 13, ¶ 48.  When asked "you didn't do anything to get rid of the vagrants?" Bolden responded, "No I didn't.  No, I sure didn't.  [The City] didn't get it—they didn't do nothing, so why would I?"  Id.

Bolden's properties had been vacant for two to three years before he sold them. See id. at 13, ¶ 47.  He decided to sell the properties because he was "behind in everything," including back taxes that were paid to Broward County out of the sale proceeds.  DE 211-1 at 21.

### C.    Gloria Burnell

Counter-Plaintiff Gloria Burnell has never lived in the City of Fort Lauderdale, but she is the beneficial owner of several rental properties in the City.  See DE 191 at 9, ¶ 28.  As pertinent here, Burnell previously owned two properties located at 2317 NW 6th Street and 2133 NW 6th Street.  See id. at 9, ¶ 29.  The property at 2317 NW 6th

Street was a former nursing home with a large addition in the back.  See id.  The front

portion contained an apartment that Burnell rented to a tenant through a verbal

agreement.  See id.  The property at 2133 NW 6th Street was a single-story triplex.

See id.

In July 2006, Burnell's property at 2317 NW 6th Street was cited for several

violations of the Florida Building Code and the City's minimum housing code.  See DE

191 at 10, ¶ 34.[9]  On December 21, 2006, the City's Unsafe Structures Board held a

hearing regarding that property, and Burnell testified at the hearing.  See id. at 10, ¶ 35.

Due to Burnell's failure to address the property's code violations, a Final Order was

entered requiring demolition of the property.  See id.

In March 2007, Burnell's property at 2133 NW 6th Street was also cited for

violating numerous provisions of the Florida Building Code and the City's minimum

housing code.  See DE 191 at 9, ¶ 30.  On May 17, 2007, a hearing was held before

the Unsafe Structures Board concerning that property, and Burnell again testified.

See id. at 9-10, ¶ 31.  She requested and was granted a thirty-day extension to turn the

power off, to board up the property with a permit from City, to demolish a failing wall,

and to return to the Board with an architect contract.  See id. at 10, ¶ 31.  On June 21,

2007, another hearing was held before the Unsafe Structures Board regarding the

same property.  See id. at 10, ¶ 32.  At that hearing, Burnell obtained another thirty-day

extension to return with building plans and proof of their submission to the City for

review, and to immediately secure the property by boarding up the windows and doors.

See id.  On July 19, 2007, a third hearing was held before the Unsafe Structures Board,

---

[9]  Both of Burnell's properties were severely damaged by Hurricane Wilma in
October 2005.  See DE 191 at 11, ¶¶ 37-38.

and Burnell once again testified.  See id. at 10, ¶ 33.  Because Burnell had failed to

sufficiently address the code violations or to respond to the Board's requests for plans

concerning the property, the Board entered a Final Order requiring that the property be

demolished.  See id.

At the time of the Unsafe Structure Board's hearings on Burnell's properties, and

before the buildings were demolished, the mortgage holders on both properties were in

the process of foreclosing because Burnell had failed to make her mortgage payments.

See DE 191 at 11, ¶ 36.  Final judgments of foreclosure were issued after the

structures were demolished.  See id.

### D.    Karen McNair

Counter-Plaintiff Karen McNair owns a home in the Northwest section of the City.

See DE 228-1 at 7.  McNair was a plaintiff in an earlier, similar action against the City

and certain of its officials, styled Velva Turner, et al. v. City of Fort Lauderdale, et al.,

Case No. 05-61635-Civ-Ungaro (S.D. Fla. filed Oct. 6, 2005) ("Turner").  The parties in

Turner reached a settlement in February 2007.  See Case No. 05-61635-Civ-Ungaro,

DE 101-1 (Memorandum of Settlement).  As part of that settlement, the City agreed to

make various changes to its code-enforcement notices.  See id. at 1.  The City also

agreed to reduce its liens against some the plaintiffs' properties, including McNair's lien,

which was reduced from $90,000 to $5,000.  See id. at 2.  The City was allowed ninety

days (until May 2007) to implement the terms of the agreement.  See id. at 3.  In

connection with the settlement, McNair executed a full release of her claims against the

City and the other defendants.  See DE 266-1.[10]

---

[10]  Because of this release, the Court will limit its discussion of McNair's present
claims to events occurring after the Turner settlement.

McNair now contends that the City has breached the <u>Turner</u> settlement agreement, mainly by continuing to issue the allegedly defective code-enforcement notices that were addressed in the settlement.  <u>See</u> DE 106 at 46-48.[11]  In her deposition, however, McNair admitted that since May 2007, she has "never seen" any code-enforcement notices from the City and does not know whether the City has corrected the alleged deficiencies.  DE 228-1 at 12-13.  McNair testified that a code-enforcement officer came to her home to discuss an unlicensed or derelict pickup truck parked on her property.  <u>See id.</u> at 14.  But after McNair corrected this problem, no further issues were raised.  <u>See id.</u>  Although McNair fears that the City will try to foreclose on her property due to code violations, McNair identified no existing violations.  <u>See</u> DE 228-1 at 15.  Further, McNair admitted that the City has not sought to foreclose on her property and that she has never been arrested for code violations or any other reason.  <u>See id.</u>

### E.   Estate of Walter Tirschman

Counter-Plaintiff Estate of Walter Tirschman ("Tirschman") formerly owned property in the City located at 2765 NW 19th Street.  <u>See</u> DE 191 at 13, ¶ 50.  In May 2007, Tirschman's property was cited for numerous violations of the Florida Building Code and the City's minimum housing code.  <u>See id.</u> at 13, ¶ 51.[12]  On October 18, 2007, a hearing was held before the Unsafe Structures Board regarding Tirschman's

---

[11]   The Court previously ruled that McNair is the only Counter-Plaintiff with standing to assert this breach-of-contract claim because in <u>Turner</u> "no class was ever certified that would allow the other Counter-Plaintiffs to enforce the Settlement Agreement."  DE 125 at 14.  Also, based on the language of the settlement agreement, the Court determined that this claim could be asserted only prospectively, i.e., for notices issued more than ninety days after the date of the agreement.  <u>See id.</u> at 15.

[12]   Tirschman's property apparently had been damaged by Hurricane Wilma. <u>See</u> DE 265-1 at 13.

property.  See id. at 13-14, ¶ 52.  At the hearing, evidence was introduced concerning the deplorable condition of the property, as well as the City's efforts to notify the owner and tenant by certified mail, posting on the property, and publication.  See id. at 14, ¶ 52.  Because Tirschman had failed to address the code violations, the Board ordered that the property be demolished.  See id.  After the demolition, Tirschman sold the property to another individual on September 2, 2008.  See id. at 13, ¶ 50; id. at 14, ¶¶ 52-53.

## II.   Procedural History

This case originated with the City's aforementioned Lien Foreclosure Action against Scott in Broward County Circuit Court.  See supra Part I.A.  Scott and the four other Counter-Plaintiffs asserted various counterclaims against the City and Alfred G. Battle, Jr., individually and as Director of the City's Northwest–Progresso–Flagler Heights District Community Redevelopment Agency, as well as two federal parties. See DE 1-3, 1-4.  In general, Counter-Plaintiffs alleged that Counter-Defendants engaged in unconstitutional code-enforcement efforts against black property owners in the Northwest portion of the City, in order to implement redevelopment plans for that area.  According to Counter-Plaintiffs, these efforts involved imposing excessive fines against the property owners, acquiring their properties through foreclosure of the resulting liens, and selling the properties to high-end developers.

After the federal parties removed the action to this Court, see DE 1, Counter-Plaintiffs filed an Amended Counterclaim, and Counter-Defendants moved to dismiss. See DE 17 (corrected version); DE 29.  The Court granted in part Counter-Defendants' motion to dismiss but allowed Counter-Plaintiffs to file another amended counterclaim.

See DE 102.[13]  Counter-Plaintiffs subsequently filed a Second Amended Counterclaim

("SAC").  See DE 106 (corrected version).

Upon Counter-Defendants' motion to dismiss the SAC, the Court dismissed

many of Counter-Plaintiffs' claims but allowed seven claims to go forward against the

City and one claim to proceed against Battle.  See DE 125.  The remaining counts in

the SAC allege the following claims:

- the notices used by the City to warn Counter-Plaintiffs of the code violations on their properties are deficient in several respects and do not satisfy procedural due process (Count II);[14]

- the City's code-enforcement operations violate Counter-Plaintiffs' substantive-due-process rights (Count III);

- the City's community redevelopment plans are intended to drive black residents out of the Northwest part of the City and therefore violate equal protection (Count VI);

- the City breached the Turner settlement agreement with respect to Counter-Plaintiff McNair (Count VII);

- various actions by the City had a disparate impact on black residents, in violation of the Fair Housing Act, see 42 U.S.C. § 3604(a) (Count X);

- the City and Battle violated equal protection by using code-enforcement tactics that targeted black residents and their property (Count XI); and

- the City's acquisition of Counter-Plaintiffs' properties through foreclosure and other means constitutes an unlawful taking because the City was instead required to use eminent domain (Count XII).

Counter-Defendants now move for summary judgment on all of these claims.

---

[13]  In a separate Order, the Court dismissed Counter-Plaintiffs' claims against the federal parties for lack of standing and lack of subject-matter jurisdiction.  See DE 91.

[14]  The Court interprets all of Counter-Plaintiffs' federal constitutional claims as alleging violations of 42 U.S.C. § 1983.

### III.    Discussion

#### A.    Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must point out to the Court that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).  Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial."  Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.

14

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker, 911 F.2d at 1577.  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).

The Court's function at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In making this determination, the Court must discern which issues are material:  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248. Moreover, in deciding a summary-judgment motion, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).

### B.      Municipal Liability Under § 1983

As a municipality, the City cannot be held liable under § 1983 for the acts of its employees based on a theory of respondeat superior.  See Scala v. City of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997) (citing Monnell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)).  Rather, to impose § 1983 liability on a municipality, a plaintiff must identify a municipal policy or custom that caused his injuries.  See Gomez v. Lozano, 759 F. Supp. 2d 1335, 1338 (S.D. Fla. 2011).  A court may hold the municipality liable "only if its custom or policy caused the municipal 'employees to violate a citizen's constitutional rights.'"  Id. (quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)).

To prove municipal liability based on custom, "a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001) (internal quotation marks omitted). Also, "a municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the misconduct." Id. (internal quotation marks omitted).

### C.   Analysis of Counter-Defendants' Motion[15]

#### 1.   Procedural Due Process

In Count II of the SAC, Counter-Plaintiffs claim that the notices used by the City to warn Counter-Plaintiffs of the code violations on their properties do not comport with procedural due process. According to Counter-Plaintiffs, the City's notices "fail to sufficiently inform recipients of their individual rights under the law, ambiguously explain the process through which the recipient may contest the finding(s) of the inspector, and operate to discourage violators from contesting the violation or appearing at the hearing through the use of illegal threats of arrest and imprisonment." DE 106 at 34, ¶ 122. Counter-Plaintiffs further assert that the City's initial Inspection Reports do not comply with Chapter 162 of the Florida Statutes because the report forms "neither informed

---

[15] Counter-Plaintiffs have responded to the summary-judgment motion in a scattershot fashion, compressing numerous arguments into a rambling and sometimes disjointed narrative. Some of these arguments are unrelated to the specific claims here, and others lack any legal or factual support. Although the Court has considered all of the issues raised by Counter-Plaintiffs, this Order will address only what appear to be Counter-Plaintiffs' main arguments. The Court finds that the other points asserted in Counter-Plaintiffs' response are without merit and do not warrant separate discussion.

Counter-plaintiffs of dates, times, or places for hearings to contest the report's findings, nor stated that Counter-plaintiffs would receive a subsequent notice of hearing." Id. at 34, ¶ 123.

A procedural-due-process claim under § 1983 "requires proof of three elements: a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process." Doe v. Florida Bar, 630 F.3d 1336, 1342 (11th Cir. 2011) (internal quotation marks omitted).  As relevant here, "individuals whose property interests are at stake due to government actions are entitled to notice of the proceedings and an opportunity to be heard." Mesa Valderrama v. United States, 417 F.3d 1189, 1196 (11th Cir. 2005).  To satisfy due process, interested persons must be given "'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Id. at 1196-97 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).  "Reasonable notice, however, requires only that the government attempt to provide actual notice; it does not require that the government demonstrate that it was successful in providing actual notice." Id. at 1197.

Here, the record demonstrates that the City provided Counter-Plaintiffs with constitutionally adequate notice of the alleged code violations and of the procedures for challenging those violations.  With respect to Scott, for example, the City's Notices of Violation included the specific code violations on his property; the corrective actions he was required to take and the deadlines for doing so; the dates and times of the hearings before the Special Master if the violations were not corrected; the fines that the Special Master could impose, resulting in a possible lien against Scott's property;

17

and the right to appeal the Special Master's decision to Circuit Court.[16]  See, e.g., DE

200-2 at 2; 200-7 at 2-3.  Similarly, the Notices of Violation issued to Burnell detailed

the alleged code violations on her properties, the required corrections and the time for

completing them, and the procedure for scheduling a hearing before the Unsafe

Structures Board.  See, e.g., DE 205-1 at 2-4; DE 207-2 at 2-4.

     Moreover, the record shows that the City made reasonable efforts to ensure that

Counter-Plaintiffs received the various notices concerning their properties.  The City

has submitted a sworn affidavit explaining that, in accordance with state and local law,

the City notifies property owners of code violations and hearings by posting on the

property, personal service on the owner or occupant, or certified mail.  See DE 197-2 at

3-4 (Sworn Aff. of Terry Burgess); see also Fla. Stat. § 162.12 (listing permissible notice

methods for local code violations); Fort Lauderdale, Fla., Code of Ordinances § 11-16

("City Code") (similar).  And no evidence refutes the City's claim that it attempted to

notify Counter-Plaintiffs through these means.  Indeed, some of the Counter-Plaintiffs,

such as Scott, specifically admitted receiving the City's notices, and nearly all of the

Counter-Plaintiffs made at least some effort to respond to the alleged code violations.

     Counter-Plaintiffs argue that certain language in the City's Inspection Reports

deterred them from appearing at the hearings and challenging the alleged code

violations because they feared being arrested and imprisoned.  These Inspection

Reports, used to initially notify property owners of alleged code violations, list various

---

[16]  Counter-Defendants argue that because Counter-Plaintiffs never appealed
any of the code violations found to exist on their properties, they are now barred from
asserting constitutional claims based on those violations.  The Court has considered
this argument but finds it to be without merit.  See Zinermon v. Burch, 494 U.S. 113,
124 (1990) (explaining that "overlapping state remedies are generally irrelevant to the
question of the existence of a cause of action under § 1983").

steps the City may take if the violations are not corrected within a specified period.

See, e.g., DE 201-8 at 2; DE 257-10 at 2.[17]  This list includes the following statement

regarding possible criminal penalties:

> A Police Officer may effect a physical arrest, issue a Notice
> to Appear, or request an Issue Summons from the City
> Prosecutor for you to appear in Broward County Court so
> that charges may be heard and adjudicated.  For every day
> the violation exists you may be fined up to $500 per day and
> face a jail sentence from 0-90 days in the Fort Lauderdale
> City Jail.

Id.  According to Counter-Plaintiffs, such criminal penalties are not authorized by Florida

law and therefore this statement improperly "discourage[s] alleged violators from

appearing at a hearing where the property owner may be arrested."  DE 254 at 13.

The Court concludes, however, that the language in the City's Inspection

Reports did not deprive Counter-Plaintiffs of procedural due process.  First, the premise

of Counter-Plaintiffs' argument—that state law prohibits criminal penalties for local code

violations—is incorrect.  Florida law expressly permits municipalities to "designate the

enforcement methods and penalties" for violations of city ordinances.  Fla. Stat.

§ 162.22.  Such authorized methods and penalties include arrest, a criminal fine of up

to $500, and imprisonment of up to 60 days.  See id.  While the City has not adopted

specific criminal penalties for code violations, choosing instead to address such

---

[17]  As previously noted, Counter-Plaintiffs also claim that the Inspection Reports
are deficient because they fail to provide specific information about the hearing at which
the property owner may contest the violations.  The Inspection Reports, however, are
only the first notices that property owners receive concerning alleged code violations.
See DE 197-2 at 3-4 (Sworn Aff. of Terry Burgess).  These initial notices allow property
owners to correct the violations without any further enforcement action.  See id.  If the
claimed violations are not corrected (and no extension of time has been sought or
granted), the City then issues a formal Notice of Violation that sets forth the procedures
for challenging the alleged violations at a hearing.  See id.

violations mainly through civil penalties, the City retains authority to enforce its code requirements by "any other means."  City Code § 11-23.  Specifically, in addition to the enforcement powers granted to it under the City Code, the City "may, in its discretion, exercise any powers given to municipalities" by Chapter 162 of the Florida Statutes.  Id. Thus, nothing in state or local law forecloses the City from enforcing code violations through arrest or short-term imprisonment.[18]

Second, even if the City exceeded its authority by including the statement about criminal penalties in the Inspection Reports, that statement did not deprive Counter-Plaintiffs of constitutionally sufficient due process.  Counter-Plaintiffs' theory is that the paragraph in the Inspection Report mentioning possible criminal penalties deterred Counter-Plaintiffs from attending the hearings and challenging the alleged code violations.  But the Notices of Violation—which were issued after Counter-Plaintiffs failed to comply with the Inspection Reports, and which provided details about a code-violation hearing—referenced possible fines but nowhere mentioned criminal sanctions. See, e.g., DE 200-7 at 3.  Moreover, even the paragraph in the Inspection Reports addressing criminal sanctions did not suggest that Counter-Plaintiffs could be arrested or imprisoned if they appeared at the hearing.  To the contrary, the immediately preceding paragraph indicated that the presiding officials at the hearing could impose a fine only.  See, e.g., DE 201-8 at 2.

---

[18]  The Court recognizes that the maximum term of imprisonment listed in the Inspection Reports, 90 days, exceeds the presumptive 60-day limit under state law. For the reasons discussed herein, however, Counter-Plaintiffs have not shown that this discrepancy deprived them of procedural due process concerning the alleged code violations.

Counter-Plaintiffs' own behavior also belies their claimed fear of criminal prosecution at the code-violation hearing or anywhere else.  Burnell appeared and testified at multiple hearings regarding her property, and Bolden attended one hearing. Scott admitted during his deposition that he "wasn't hiding" and that the City Police could have arrested him at his home (yet never did).  DE 252-11 at 7.  Scott also repeatedly met with City officials to discuss the code violations on his property.  Scott avoided the hearings, however, because he had not corrected the code violations on his rental property.  In sum, the record does not support Counter-Plaintiffs' claim that fear of criminal penalties deterred them from challenging the code violations.

For all these reasons, the record shows conclusively that the City's notices afforded Counter-Plaintiffs adequate due process in connection with their alleged code violations.  The Court therefore grants summary judgment to Counter-Defendants on Counter-Plaintiffs' procedural-due-process claim.

## 2.    Substantive Due Process

In Count III of the SAC, Counter-Plaintiffs claim that the City's code-enforcement practices violate substantive due process.  Counter-Plaintiffs allege that the City "engage[d] in a fraudulent scheme to take property" by targeting predominately black neighborhoods for a code-enforcement sweep and imposing "excessive and manufactured fines" on Counter-Plaintiffs.  DE 106 at 35-36.[19]

---

[19]  As part of this claim, and throughout their SAC and motion response, Counter-Plaintiffs refer to various government funds that they would have received but for the City's alleged conduct.  Yet Counter-Plaintiffs fail to identify the specific programs for which they were eligible, the basis for that eligibility, and the particular conduct by the City that deprived them of benefits.  In many instances, these arguments seem to be nothing more than policy disagreements with how the City allocated discretionary funds.  Because these claims lack any clear legal or factual basis, the Court will not address them further.

To prove a violation of substantive due process, a plaintiff must show that she was deprived of a constitutionally protected interest through "an abuse of government power." Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1577 (11th Cir. 1989) (internal quotation marks omitted). In this respect, "[t]he Due Process Clause protects individuals against arbitrary exercises of government power." T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., 610 F.3d 588, 598 (11th Cir. 2010). But because "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" the government's actions must "shock[] the conscience" in order to violate substantive due process. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 129 (1992)). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849.

Counter-Plaintiffs' substantive-due-process claim appears to focus on a code-enforcement operation ("NEAT") that the City conducted in parts of Northwest Fort Lauderdale in late 2003 and early 2004. See DE 257-2 at 2-3 (listing NEAT code-enforcement assignments); DE 265-1 at 2 (displaying Neat Sector Map). As Counter-Defendants point out, however, Scott and McNair could not have been affected by this operation because their properties were not located in the NEAT area, and Bolden no longer owned his properties at the time of the operation. See DE 263 at 2. In any event, based on the timing of the code-enforcement actions against Counter-Plaintiffs, it appears that none of the violations at issue here resulted from the NEAT operation. See supra Part I.

Even if Counter-Plaintiffs' claim were construed more broadly, the record evidence refutes any claim that the City imposed "excessive and manufactured fines"

on Counter-Plaintiffs.  As already discussed, the record shows that specific, often serious problems existed with Counter-Plaintiffs' properties but that Counter-Plaintiffs were either unable or unwilling to correct those issues in a timely manner.  Also, as detailed below with respect to Counter-Plaintiffs' equal-protection claims, the record fails to establish any "fraudulent scheme" by the City to acquire properties from black owners through code enforcement.  Because Counter-Plaintiffs have presented no evidence that the City engaged in "conscience-shocking" behavior of any kind, see Lewis, 523 U.S. at 849, Counter-Defendants are entitled to summary judgment on the substantive-due-process claim.

### 3.    Equal Protection

In Count VI of the SAC, Counter-Plaintiffs allege that the City violated equal protection by implementing community-redevelopment plans designed to "eliminate the Blacks from the [Northwest] area by eventually foreclosing and demolishing their properties, all without compensation."  DE 106 at 45-46.  Similarly, in Count XI, Counter-Plaintiffs assert that the City and Battle used code-enforcement tactics that targeted black residents and their properties, also in violation of equal protection. See id. at 51-65.

A claim under the Equal Protection Clause requires proof of two elements: "(1) differential treatment from others similarly situated; and (2) intentional discrimination."  Henniger v. Pinellas Cnty., 7 F. Supp. 2d 1334, 1339 (M.D. Fla. 1998). Regarding the second element, it is well established that "proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim."  Parks v. City of Warner Robins, 43 F.3d 609, 616 (11th Cir. 1995) (citing Hernandez v. New York, 500 U.S. 352, 359-60 (1991)); see Kunkler v. Fort Lauderdale Hous. Auth., 764 F.

Supp. 171, 175 (S.D. Fla. 1991) ("Absent any allegation of discriminatory purpose, a mere failure of those who administer the law to treat equally all persons who violate the law does not constitute a denial of equal protection." (citing United States v. Batchelder, 442 U.S. 114 (1979))).  "Possible indicia of discriminatory intent include a clear pattern of disparate impact, unexplainable on grounds other than race; the historical background of the challenged decision or the specific events leading up to the decision; procedural or substantive departures from the norm; and the legislative or administrative history of the challenged statute."  Id. at 617 (citing Vill. of Arlington Heights v. Metro. Dev. Hous. Corp., 429 U.S. 252, 266-68 (1977)).

As to the first element of their equal-protection claims, Counter-Plaintiffs point to evidence suggesting that the City conducted more intensive code-enforcement operations in the Northwest section of the City than in other areas.  See, e.g., DE 258-6 (Aff. of Burt Fletcher).  This evidence, however, does not necessarily establish that the City subjected the individual Counter-Plaintiffs to "differential treatment from others similarly situated."  Henniger, 7 F. Supp. 2d at 1339.  In particular, Counter-Plaintiffs have identified no property owners in other parts of the City who committed similar code violations but received more lenient treatment.

But even if the record creates a triable issue of fact on the differential-treatment element, Counter-Plaintiffs have presented no evidence that the City's redevelopment plans or code-enforcement efforts were motivated by intentional racial discrimination.  Counter-Plaintiffs broadly allege that the City ignored the Northwest section and its predominately black residents until the early 2000s, when the City began to implement redevelopment plans for that area.  To carry out these plans, Counter-Plaintiffs claim that the City began a campaign to acquire land from black property owners by imposing

excessive code-violation fines and foreclosing on the resulting liens when the owners could not pay them.  The problem with Counter-Plaintiffs' theory is that, based on the record evidence, this "land grab" never happened.

Counter-Defendants have presented unrebutted evidence that from 2001 through 2011, the City obtained a Final Judgment of Foreclosure on, and acquired possession of, a total of three properties.  See DE 197-1 at 3, ¶ 3 (Sworn Aff. of Ginger E. Wald).  In one of those cases, after the City foreclosed on the property, the bank foreclosed against the City and the property owner and acquired the property at the foreclosure sale.  See id.  Over this same ten-year period, the City filed twenty other actions to foreclose on liens owed to the City, but none of those actions resulted in the City obtaining the properties:

- ten cases were voluntarily dismissed by the City upon payment of the liens, and the City released the liens;

- one property was foreclosed on by the bank, and the City's lien was extinguished;

- in one case the City obtained a final judgment but cancelled the foreclosure sale due to the bank filing a notice of lis pendens;

- two properties were sold in tax-deed sales, and the properties were not acquired by the City;

- one action resulted in a final judgment for the City, but the City assigned that judgment to another entity upon payment of the lien; and

- five actions remain pending, including the case involving Counter-Plaintiff Scott's property.[20]

See id. at 3-4, ¶ 4.  Further, out of the twenty-three foreclosure cases filed by the City

_____

[20]  As noted herein, Scott's property was sold at a tax-deed sale, and the City has moved to dismiss the foreclosure action concerning that property.

between 2001 and 2011, nine were brought against corporate, business, or investment entities, and not against individual single-family property owners.  See id. at 4, ¶ 5. While Counter-Plaintiffs note that these statistics do not include properties that were ordered demolished by the City, Counter-Plaintiffs offer no evidence that the City acquired a significant number of properties after the structures thereon were demolished.

Nor do the facts involving the individual Counter-Plaintiffs demonstrate any widespread effort by Counter-Defendants to deprive black property owners of their land. As discussed above, not one of Counter-Plaintiffs' properties was acquired by the City. Most of the Counter-Plaintiffs either voluntarily sold their properties or lost them for reasons unconnected to the liens or demolitions.[21]  And one of the Counter-Plaintiffs, McNair, still lives in her home.  Because no evidence shows that Counter-Defendants intentionally discriminated against Counter-Plaintiffs or any other black property owners, the Court grants summary judgment to the City and Battle on Counter-Plaintiffs' equal-protection claims.[22]

---

[21]  Counter-Plaintiffs point to evidence indicating that City Commissioner Carlton Moore unsuccessfully pressured Bolden to sell one of his properties to Moore.  See, e.g., DE 258-5 at 6.  But even viewing this evidence in the light most favorable to Counter-Plaintiffs, it does not demonstrate a widespread illegal practice conducted or approved by the City.  See Griffin, 261 F.3d at 1308.

[22]  Since Counter-Plaintiffs have presented no evidence that Battle violated their equal-protection rights, Battle is also entitled to qualified immunity.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

### 4.   <u>Turner</u> Settlement Agreement (McNair Only)

Counter-Plaintiff McNair alleges, in Count VII of the SAC, that the City has breached its prior settlement agreement with her in <u>Turner</u>.  <u>See</u> DE 106 at 46-48; <u>supra</u> Part I.D.  McNair primarily contends that the City has not made the agreed-upon changes to its code-enforcement notices and that McNair has suffered injuries as a result of this breach.  <u>See</u> <u>id.</u>

As noted above, however, McNair admitted that since May 2007, she has "never seen" any code-enforcement notices from the City and does not know whether the City has corrected the alleged deficiencies.  DE 228-1 at 12-13.  McNair further testified that since the time of the <u>Turner</u> settlement, her only involvement in code-enforcement activity occurred when an inspector visited her home to discuss a defective truck parked on her property.  <u>See</u> <u>id.</u> at 14.  McNair promptly corrected that problem, and no further issues were raised.  <u>See</u> <u>id.</u>  In view of these undisputed facts, no evidence supports McNair's claim that the City breached the <u>Turner</u> settlement agreement with respect to her.  Thus, the Court grants summary judgment to the City on this claim.

### 5.   Fair Housing Act

In Count X of the SAC, Counter-Plaintiffs assert that the City violated the Fair Housing Act ("FHA").  Specifically, Counter-Plaintiffs allege a violation of 42 U.S.C. § 3604(a), which makes it unlawful to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race . . . ."  Based on the same conduct alleged in their equal-protection claims, Counter-Plaintiffs maintain that the City's redevelopment plans and code-enforcement efforts in the Northwest section of the City had a disparate impact on black property owners there.

Establishing an FHA violation normally does not require proof of discriminatory intent.  See Reese v. Miami-Dade Cnty., 242 F. Supp. 2d 1292, 1301 (S.D. Fla. 2002). In evaluating an FHA claim alleging disparate impact, courts consider various factors, including "the strength of a plaintiff's showing of discriminatory effect," any evidence of discriminatory intent, and the defendant's interest in taking the challenged action.  Id. at 1304.  When an FHA plaintiff does allege discriminatory intent, however, the plaintiff "has the burden of showing that the defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA."  Id. at 1301.

For the reasons discussed in connection with their equal-protection claims, Counter-Plaintiffs have not shown that the City took any action that had a discriminatory effect on the City's Northwest property owners in general or on Counter-Plaintiffs in particular.  The City's acquisition of three properties through foreclosure over a ten-year period, none belonging to Counter-Plaintiffs, cannot support Counter-Plaintiffs' claim that the City engaged in widespread effort to obtain land from black property owners through a code-enforcement scheme.  Even assuming that such actions would have furthered the City's interests in redevelopment, no evidence shows that the City engaged in conduct that was motivated by a discriminatory intent or that had a discriminatory effect.  Therefore, the Court grants summary judgment to the City on Counter-Plaintiffs' FHA claim.

### 6. Unlawful Taking

Count XII of the SAC alleges that the City's acquisition of Counter-Plaintiffs' properties through foreclosure and other means constitutes an unlawful taking without just compensation.  See DE 106 at 66-68.  According to Counter-Plaintiffs, "the City's

alleged entitlement to the proceeds of forced sales of properties of Counter-plaintiffs and others similarly situated require it to exercise that entitlement through its eminent domain power, rather than through seizures, demolitions, and foreclosures." Id. at 66.

This claim suffers from two fundamental problems.  First, as already explained, the City never acquired ownership of any of Counter-Plaintiffs' properties.  Second, to the extent that the City took other actions regarding those properties, such as recording liens or demolishing structures, the record shows that those steps resulted from code violations that Counter-Plaintiffs did not timely correct.  No evidence suggests that those actions involved an effort by the City to take the properties for public use. See Kelo v. City of New London, 545 U.S. 469, 477-80 (2005).  Counter-Plaintiffs' takings claim therefore fails, and the City is granted summary judgment on that claim.

### D.    Motion to Dismiss Foreclosure Action Against Scott

Last, the City has moved to dismiss its Lien Foreclosure Action against Scott and his unknown spouse because the underlying property was sold to a private entity in a July 2011 tax-deed sale, and Scott no longer possesses any ownership interest in the property.  See DE 275.  In view of this development, the parties agree that the foreclosure action should be dismissed.  In their motion papers, however, the parties debate whether the dismissal should be with or without prejudice.

Having carefully reviewed all the relevant filings, the Court concludes that the foreclosure action should be dismissed with prejudice.  It is undisputed that Scott retains no interest in the property, and there appears to be no realistic possibility that the City will re-file its foreclosure complaint against him.  Because the foreclosure action against Scott is now moot, the Court will dismiss that action with prejudice.

## IV.    Conclusion

Accordingly, it is **ORDERED and ADJUDGED** as follows:

1.    Plaintiff/Counter-Defendant City of Fort Lauderdale's and Counter-Defendant Alfred G. Battle, Jr.'s Motion for Final Summary Judgment [DE 192] is hereby **GRANTED**;

2.    Plaintiff City of Fort Lauderdale's Motion to Dismiss Foreclosure Action Against Defendant Hezzekiah Scott [DE 275] is hereby **GRANTED,** and the City's lien foreclosure action against Scott and his unknown spouse is hereby **DISMISSED WITH PREJUDICE**;

3.    Plaintiff/Counter-Defendant City of Fort Lauderdale's and Counter-Defendant Alfred G. Battle, Jr.'s Motion in Limine [DE 234] is hereby **DENIED as moot**;

4.    The calendar call scheduled for September 6, 2012, is hereby **CANCELLED**, and the case is removed from the Court's September 10, 2012, trial calendar; and

5.    The Court will enter a separate Final Judgment in this action.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 23rd day of August, 2012.

JAMES I. COHN
United States District Judge

Copies furnished to:

Counsel of record via CM/ECF

30